# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

       *Plaintiff,*

 v.

UNITED STATES SUGAR
CORPORATION, UNITED SUGARS
CORPORATION, IMPERIAL SUGAR
COMPANY, and LOUIS DREYFUS
COMPANY LLC,

       *Defendants.*

## COMPLAINT

The United States of America brings this civil action to stop United States Sugar Corporation ("U.S. Sugar") from acquiring its rival sugar refiner, Imperial Sugar Company ("Imperial") in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. U.S. Sugar is a member and owner of United Sugars Corporation ("United"), a cooperative that sells—and sets the prices for—all the sugar produced by U.S. Sugar and three other sugar refiners. If U.S. Sugar is allowed to acquire Imperial and to fold Imperial's production into the United cooperative, United and just one other company, American Sugar Refining ("ASR" or "Domino"), would account for nearly 75 percent of sugar sales across the Southeast, leaving wholesale customers in this region at the mercy of a cozy duopoly. As a result, fragile supply chains would be further strained, and American families would pay more for sugar and many staple food and beverage products.

Due to the locations of the U.S. Sugar refinery and the refineries of the other United members, United is in a particularly strong position to supply the sugar needs of grocery stores, distributors, food and beverage manufacturers, and other customers located across the

Southeastern United States. Imperial, which operates a large refinery located in Georgia, is one of the few competitive constraints on United in the Southeastern United States. Today, competition from Imperial causes United to lower prices. Competition from Imperial also causes United to improve delivery reliability, which is a crucial factor for food manufacturers and grocery stores that depend on a robust supply chain to run their businesses. This is a straightforward case: the merger of two direct competitors that will result in a highly concentrated market and lead to higher prices for a product that is vital to our country's food supply. Simply put: this case is not a close call.

The United States alleges as follows:

## I.    INTRODUCTION

1.      Sugar is a ubiquitous ingredient found in almost every American's kitchen and in Americans' favorite foods and beverages. It is refined from sugar beets or sugarcane and sold to wholesale customers in various forms (e.g., granulated, liquid, and powdered) and varieties (e.g., white and brown sugar). It then makes its way onto grocery shelves and into the foods Americans eat every day. In 2020, the average American consumed 40 pounds of refined sugar.

2.      U.S. Sugar sells its sugar through United, a marketing cooperative that is jointly owned and controlled by U.S. Sugar and three other sugar producers. The four owners of United do not compete with one another; United manages all aspects of the sale and marketing of its owners' sugar, including deciding whether to submit a bid for a particular customer and what price to charge. If U.S. Sugar acquires Imperial, United would also gain control over the sale and marketing of all sugar produced by Imperial, thereby eliminating competition between United and Imperial.

3.      United and Imperial are two of the three largest suppliers of refined sugar to grocery stores, distributors, and food and beverage manufacturers located across the regions defined by the U.S. Census Bureau as the East South Central and South Atlantic United States, an area that stretches from Mississippi to Delaware ("the Southeast").  Transportation costs can add thousands of dollars to the total cost of a delivery, and the need to ship refined sugar even a few hundred additional miles can yield a substantially higher total price for the customer.  Based on data from United, shipping refined sugar an additional 500 miles by truck would increase the price of delivered sugar by over 10 percent.  Making the same shipment entirely via rail, which is often impossible, would increase the price of delivered sugar by more than five percent.  Because of these transportation costs, wholesale customers in the Southeast rely heavily on producers that have large refineries located nearby.  United has an advantage in this region through its ability to sell sugar from U.S. Sugar's refinery in Florida, as well as from other United members' refineries.  Imperial is also well positioned to serve customers in the Southeast from its refinery in Savannah, Georgia.  Buying from United and Imperial helps customers in the Southeast keep costs low, and ensures they continue to have reliable and affordable access to this essential ingredient for their products.  In addition to United and Imperial, large conglomerate ASR, often referred to by its "Domino" brand name, has significant sales in the Southeast owing to its major refineries in Florida, Maryland, and Louisiana.

4.      If the transaction is completed, just two multibillion-dollar corporations, United and Domino, would control approximately 75 percent of sugar sales in the Southeast, a region where over 5.5 billion pounds of refined sugar are purchased each year.  As shown in the estimated shares figure below, although other sugar suppliers sometimes sell to customers in the Southeast, they provide  much  smaller  quantities  because  they  operate  at  a  significant  disadvantage  due  to

transportation and shipping costs and/or capacity constraints, among other competitive limitations. Other suppliers therefore would have limited ability or incentive to constrain the dominance of United and Domino. United and Domino would be even more dominant in Imperial's backyard: Georgia and the five states that border it. For these states, more distant suppliers face even higher transportation costs, and consequently they are more limited in their ability to compete effectively.



5.      Today, United and Imperial compete head-to-head to supply refined sugar to customers across the Southeast. This competition has led to lower prices, better service reliability, and better product quality for wholesale customers in this region. For example, for many years, United and Imperial have competed fiercely with one another to win the business of a large American food manufacturer, leading Imperial's Vice President of Sales to complain, "on EVERY bid we have won on the auction and we were #1 in price, United has come back in after the fact . . . with a lower price and then got the business." In another instance, when United and Imperial were competing to win the business of another major food manufacturer, United acknowledged

that it had "a significant freight disadvantage over one competitor in Savanah [sic], GA which is why [United] went with a much lower" price to retain the business. United's only competitor in Savannah is Imperial. The proposed acquisition would eliminate this competition, enabling United to raise prices and reduce quality and service reliability for customers throughout the Southeast, to the detriment of millions of American consumers, including families who would be forced to pay more to stock their kitchen pantries.

6. The proposed acquisition also would increase the likelihood that United and Domino, the two largest remaining refiners, will find it in their mutual self-interest to coordinate rather than compete on price, quality, and service reliability. Indeed, after the acquisition was announced, Domino's Vice President of Commodities Purchasing told his colleagues that he had spoken directly with Imperial's CEO. Reporting on that conversation, the Domino executive opined that U.S. Sugar's proposed acquisition of Imperial "likely is a good thing for us." Likewise, Domino's Director of National Accounts observed: "It's going to be more important than ever to stay close to United. . . . This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

7. Although the proposed acquisition would be "a good thing" for billion-dollar refined sugar companies, it would not be good for competition, or for wholesale customers and American consumers. For the reasons discussed below, the proposed acquisition would likely result in substantial harm to wholesale customers and other American consumers in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be blocked.

## II. DEFENDANTS AND THE PROPOSED TRANSACTION

8. U.S. Sugar is the world's largest vertically-integrated cane sugar milling and refining corporation, capable of processing 850,000 tons of refined sugar per year. It owns over

200,000 acres of land in central Florida, as well as a cane milling facility and a nearby cane sugar refinery in Clewiston, Florida.  U.S. Sugar harvests cane from the land owned by the company, mills that cane into raw sugar, and then converts that raw sugar into refined sugar at the Clewiston refinery.  U.S. Sugar is one of four member-owners of United, a marketing cooperative that markets and sells all of the refined sugar produced by U.S. Sugar and its three other member-owners.  In 2020, U.S. Sugar received payments of $533 million from United, representing the company's share of United's net profits from sales of the refined sugar produced by the member-owners.  U.S. Sugar is a Delaware corporation headquartered in Florida.

9.     As discussed above, United is a cooperative owned by four sugar refiners: U.S. Sugar, American Crystal Sugar Company, Minn-Dak Farmers Cooperative, and Wyoming Sugar Company.  Its member-owners operate nine sugar refineries located in Florida, Minnesota, Montana, North Dakota, and Wyoming.  In 2020, United generated $1.8 billion in sales.  United is a Minnesota corporation with headquarters in Minnesota.

10.     Defendant Louis Dreyfus Company LLC ("Louis Dreyfus") is a worldwide leader in sugar trading and merchandising.  Louis Dreyfus is a Delaware corporation with several U.S. offices.

11.     Imperial is a wholly-owned subsidiary of Louis Dreyfus, with headquarters in Sugar Land, Texas.  Imperial produces refined sugar in the United States and independently markets and sells its refined sugar products.  Imperial has a cane sugar refinery in Savannah, Georgia and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky.  Imperial's revenues exceeded $700 million in 2020.

12.     In 2019, on behalf of itself and its members, United sought to acquire Imperial but Louis Dreyfus rejected United's offer as too low.  Shortly thereafter, one of United's member-owners, U.S. Sugar, pursued the acquisition of Imperial.

13.     On March 24, 2021, U.S. Sugar and Louis Dreyfus entered into an asset purchase agreement whereby U.S. Sugar would acquire all of Imperial's assets for approximately $315 million.  United, U.S. Sugar, Imperial, and Louis Dreyfus simultaneously entered into a side letter agreement dated March 24, 2021, whereby United agreed to comply with certain obligations of the asset purchase agreement.  On April 20, 2021, United entered into an agreement with U.S. Sugar and the other member-owners pursuant to which United would market and sell all of the refined sugar produced by Imperial if U.S. Sugar is permitted to acquire Imperial.

## III.     INDUSTRY OVERVIEW

### A.     The Sugar Production Process

14.     Refined sugar can be produced from either cane or beets.  In the United States, sugarcane is grown only in the tropical and semitropical climates of Florida, Louisiana, and Texas. Sugar beets are grown in a range of temperate climate conditions across eleven states: California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming.  Sugarcane is not a genetically modified crop, while sugar beets grown in the United States are genetically modified.  After it is harvested, sugarcane is converted to "raw" sugar at sugar mills, and then the raw sugar is processed into refined sugar at refineries.  Harvested sugar beets are processed in a single facility where they are converted into refined sugar directly with no milling process required.

15.     Refined sugar is predominantly sold in granulated form, including the familiar dry white granulated sugar that many households stock in their kitchens.  Refined sugar also may be

modified into liquid sugar (by dissolving granulated sugar in water or, for a few liquid-only producers, by melting raw sugar), brown sugar (by adding molasses to granulated sugar), or powdered sugar (by pulverizing granulated sugar and adding corn starch).

16.     As only a portion of the raw sugar necessary to meet the demand of domestic sugarcane refineries is produced domestically, some domestic sugar refiners import raw sugar into the United States.  On the East Coast, only Imperial and Domino refine imported raw sugar into dry forms of refined sugar.  Pursuant to agreements between the United States and other sugar exporting countries, a limited quantity of raw cane sugar and refined sugar may be imported into the United States at low tariffs or duty-free.  The U.S. Department of Agriculture ("USDA") has authority to increase the quantity of imports from Mexico and other exporting countries under certain circumstances.

17.     The USDA administers a sugar loan program that essentially sets a floor for raw and refined sugar prices; however, the USDA does not prescribe the price that sugar refiners may charge their customers for refined sugar, nor does the USDA set the terms and conditions of private contracts between sugar refiners and their customers.  Since early 2014, for example, the wholesale price of sugar has increased substantially.

**B.     Producers of Refined Sugar**

18.     Few companies refine sugar in the United States.  Only four companies produce dry refined cane sugar:  the Defendants, Domino, and Louisiana Sugar Refinery ("LSR").  Domino has cane refineries in California, Florida, Louisiana, Maryland, and New York.  LSR has a cane refinery in Louisiana and markets and sells all of its refined sugar through its partner, Cargill. There are also two small liquid refiners—CSC Sugar and Sucro Sourcing—that produce liquid

cane sugar directly from raw sugar, but these liquid refiners do not produce any dry refined sugar in the United States.

19.     In addition to United's beet sugar member-owners, there are three other beet sugar producers—National Sugar Marketing ("NSM"), Michigan Sugar, and Western Sugar.  NSM is a marketing entity that sells refined sugar made by two beet cooperatives, which have beet processing facilities in California, Idaho, and Minnesota.  NSM makes only a small volume of sales to customers in the Southeast.  Michigan Sugar has beet processing facilities in Michigan with negligible sales to customers in the Southeast.  Finally, Western Sugar has beet processing facilities in Colorado, Montana, Nebraska, and Wyoming.  Western Sugar sells primarily to customers west of the Mississippi River and has negligible sales to customers in the Southeast.

### C.     Marketing and Distribution to Customers

20.     Sugar producers market and sell refined sugar to wholesale customers including retailers, food and beverage manufacturers, and distributors that re-sell refined sugar to other customers.  Each customer may have slightly different needs and preferences.  For instance, some customers are looking only for granulated sugar, whereas others may want liquid sugar, and other customers may be able to purchase or use either.  Some customers require refined cane sugar in order to market their products as "Non-GMO" or as containing "pure cane sugar," whereas other customers may be willing to purchase either cane or beet sugar.  Whatever specifications a customer may have, all of these forms of sugar are refined sugar.

21.     Customers can buy granulated refined sugar in either bulk or packaged form and have it shipped by train or truck.  Packaged granulated refined sugar comes in various sizes (e.g., 10- or 50-pound bags, 2,400-pound supersacks) and is typically delivered by truck.  Certain customers operate facilities that can readily accommodate deliveries of granulated refined sugar

in bulk.  Such customers often prefer bulk shipments because it is more efficient and reduces labor costs.  Other customers are not set up to receive bulk deliveries of granulated refined sugar.

22.     Customers typically purchase refined sugar annually pursuant to a request for proposal or other form of bid solicitation.  As part of the bidding process, customers specify the type or variety of refined sugar products required (e.g., granulated, brown, powdered, or liquid), whether the customer requires cane sugar, volume requirements, and delivery locations.  Prices and terms of sale are finalized in individual negotiations.  Customers rely on competition between refined sugar producers to obtain competitive prices and to ensure product quality and reliable service.

23.     Sugar producers' customers include sugar distributors that resell refined sugar to their own customers.  Distributors primarily serve as a sales channel for sugar producers to reach smaller customers.  United and Imperial both have separate sales teams focused on the distributor customer channel.  Distributors have no capability to process raw sugar into refined sugar.  Instead, they are essentially resellers that rely largely on domestic sugar producers to source granulated refined sugar.  Distributors may also source from some of the limited quantities of granulated refined sugar imports.  Distributors generally resell the same refined sugar products they purchase from producers, but some distributors further process the granulated refined sugar they purchase from producers to create brown, powdered, or liquid sugar for resale.  Distributors tend to sell to customers on a spot basis (i.e., a one-time transaction) or focus on serving customers that need less than a full truckload of sugar for a given delivery.  Larger customers do not generally purchase from distributors because buying directly from the sugar producers is typically the most cost-competitive option.  In addition, many customers that require or prefer bulk shipments do not view the limited quantities of imported sugar sold by distributors as a viable option due to many factors.

10

These reasons include the labor cost to empty the imported packaged bags into bulk containers, and concerns about the quality and safety of imported sugar.

24.     Customers pay a delivered price, i.e., one that includes transportation costs.  The distance between a sugar producer and the customer is a significant determining factor in the price a customer pays for refined sugar.  Transportation costs make up a significant percentage of the delivered cost of refined sugar.  Shorter shipping distances also reduce the likelihood of shipping delays, which can be very costly for customers that depend on a reliable supply of ingredients to run their facilities.  Longer shipping distances also increase the likelihood of damage to the refined sugar.  For these reasons, customers often buy refined sugar from producers in close proximity.

## IV.     RELEVANT MARKETS

25.     Courts define a relevant market to help determine the areas of competition most likely to be affected by a merger.  A relevant market has both a product and a geographic dimension.

26.     Unless enjoined, the proposed transaction would result in anticompetitive effects in the production and sale of refined sugar sold to wholesale customers such as industrial food and beverage manufacturers, distributors, and retailers located in (1) the Southeastern United States and (2) Georgia, where Imperial's refinery resides, and its bordering states.  As recognized by the Supreme Court and the U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*, the focus in defining product markets is the extent of substitution in response to changes in price or quality.  One tool used to assess the extent to which products are substitutes, and thus whether they belong in the same market, is known as the "hypothetical monopolist" test.  This test, as described in the *Horizontal Merger Guidelines*, asks whether a firm that is the only seller of a product (a hypothetical monopolist) could profitably impose a price increase—

specifically, a small but significant and non-transitory increase in price—on at least one product sold by the merging firms in the relevant product market. As described below, the relevant markets satisfy this hypothetical monopolist test.

### A. The Production and Sale of Refined Sugar is a Relevant Product Market

27. The production and sale of refined sugar is a relevant product and a line of commerce under Section 7 of the Clayton Act and is a relevant product market in which competitive effects can be assessed. Refined sugar is food-grade sugar that is produced by refining either sugar beets or raw cane sugar. Although some customers may not see beet sugar and cane sugar as substitutes, and the acquisition would result in even higher concentration in the sale of cane sugar, it is not necessary to consider separate markets for refined beet sugar and refined cane sugar to determine that the acquisition is likely to lessen competition. Refined sugar is sold primarily as granulated refined sugar but may also be sold as liquid sugar, brown sugar, or powdered sugar. An industrial food or beverage customer that uses refined sugar in its products is unlikely to switch to using another sweetener because it would require changing recipes, production methods, and product labeling, which risks depressing demand for its products. Similarly, grocery stores and other retail customers are unlikely to replace sugar on their shelves with other sweetener products because American households demand sugar for uses like baking cookies and sweetening coffee. Other kinds of sweeteners, such as high fructose corn syrup, are not reasonable substitutes for sugar.

28. For these reasons, the production and sale of refined sugar satisfies the well-accepted hypothetical monopolist test set forth in the *Horizontal Merger Guidelines*. A hypothetical monopolist of the production and sale of refined sugar would likely raise prices by a small but significant and non-transitory amount because substitution away from refined sugar would be insufficient to make that price increase unprofitable. Accordingly, the production and

sale of refined sugar constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.

**B.    The Proposed Transaction Would Harm Customers in Two Relevant Geographic Markets**

29.    The proposed transaction would harm customers across the Southeast.  Within this broader geographic market is a narrower region, spanning Georgia and bordering states, in which the harm from the transaction is likely to be especially acute because the Imperial refinery is located in Georgia.  The competition between United and Imperial is particularly important for customers in these states.  This narrower region also constitutes a relevant geographic market in which the competitive effects of the proposed transaction should be evaluated.

30.    When a supplier can price differently based on a customer's location, the relevant geographic market may be defined based on the locations of targeted customers.  Refined sugar producers can and do charge different prices to customers in different areas.  They negotiate prices with each individual customer for each individual customer location.  In addition, the cost to transport refined sugar limits the geographic reach from which a customer can cost-effectively buy refined sugar.  Moreover, due to the transportation costs, concerns over quality, and risks of contamination, most customers cannot practically buy refined sugar from a different customer located outside of the relevant geographic market (i.e., by engaging in arbitrage).

**(1)    The Southeast is a Relevant Geographic Market**

31.    United and Imperial compete vigorously for customers with food and beverage manufacturing facilities, distribution warehouses, or retail stores across the Southeast, a region that includes the areas that the U.S. Census Bureau defines as the East South Central and the South Atlantic:  Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.

32.     The Southeast is a relevant geographic market under Section 7 of the Clayton Act. Customers with manufacturing facilities, retail stores, or distribution warehouses in the Southeast do not have reasonable substitutes for refined sugar in this geographic region.  Thus, a hypothetical monopolist producer of refined sugar sold to customers that have manufacturing facilities, retail stores, or distribution warehouses in the Southeast would likely increase prices by at least a small but significant and non-transitory amount.  This price increase would not be defeated by substitution away from refined sugar or by arbitrage.

### (2)     Georgia and Its Bordering States is a Relevant Geographic Market

33.     Within the Southeast, customers in Georgia and its bordering states would face particularly acute harm because United and Imperial are especially close competitors for these customers given Defendants' refinery locations and the locations of other sugar producers. Therefore, it is also appropriate to assess the competitive effects of the proposed transaction by considering the effects on customers within this narrower area.  Accordingly, the states of Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee constitute a relevant geographic market and section of the country under Section 7 of the Clayton Act.  This geographic market encompasses Georgia, where the Imperial refinery is located, and its bordering states.

34.     The states constituting this narrower relevant market are shaded red in Figure 1 below, a March 2020 United presentation to the United Executive Committee, comprised of the CEOs of United's four member-owners, with the title "Regional Markets Overview."  As United's Executive Vice President of Industrial Sales explained, this Regional Markets Overview presentation was provided to assist with analyzing "what geographies would result . . . in the best net selling price" for the incremental refined sugar volume United's members planned to produce. Each shaded geographic region of Figure 1 represents the "Supplier Backyards"—or, as the

executive explained, the "geographies in which the producers that are identified in those various regions have freight advantage." This Regional Markets Overview identifies United (by selling the refined sugar produced at U.S. Sugar's Clewiston refinery), Imperial, and Domino (by selling out of its South Bay, Florida refinery) as the producers with a freight cost advantage over other refined sugar producers for customers located in the red-shaded states.

**Figure 1. United Map Identifying Competitors' Regional Freight Cost Advantages**



35.    The narrower market of Georgia and bordering states satisfies the hypothetical monopolist test and is a relevant geographic market under Section 7 of the Clayton Act. Customers located in Georgia and its bordering states do not have reasonable alternatives to purchasing refined sugar in this narrower market. Thus, a hypothetical monopolist producer of refined sugar sold to customers with manufacturing facilities, retail stores, or distribution warehouses in Georgia and its bordering states would likely increase prices by at least a small but significant and non-transitory amount. This price increase would not be defeated by substitution away from refined sugar or by arbitrage.

## V.     ANTICOMPETITIVE EFFECTS

36.     The proposed transaction would leave only two major refined sugar producers supplying to both relevant geographic markets—United (selling its member-owners' sugar production) and Domino.  Together, these companies would control about 75 percent of refined sugar sales to customers in each relevant geographic market.  Important head-to-head competition between United and Imperial would be eliminated, and these already concentrated markets would become even more concentrated.  As a result of this disruption to the competitive process, United would likely raise prices and face reduced pressure to provide reliable service and a high-quality product.  The proposed transaction also would increase the likelihood of coordination between United and Domino.  Unless enjoined, the proposed acquisition would raise costs for food and beverage manufacturers, retailers, distributors, and ultimately American households.

### A.     The Transaction is Presumptively Unlawful in the Relevant Markets

37.     The Supreme Court has held that mergers that significantly increase concentration in concentrated markets are presumptively anticompetitive and unlawful.  To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI").  HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.  Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive.

38.     Using this measure, the proposed acquisition is presumed anticompetitive in both relevant markets and thus is presumptively unlawful.  United makes all of the pricing and selling decisions on behalf of all its member-owners, and if the transaction is completed would make all pricing and selling decisions for Imperial as well.  United, not its individual members, is viewed as the competitor in the market by Imperial, other refined sugar suppliers, and customers.

16

Therefore, to reflect these market realities, the proper measure of concentration combines all of United's sales in the relevant markets. In the market for the production and sale of refined sugar to customers located in the Southeast, the proposed acquisition of Imperial would significantly increase concentration, from an HHI of about 2,000 to an HHI of over 2,800, an increase of over 800 points. Similarly, in the market for the production and sale of refined sugar to customers located in Georgia and its bordering states, the proposed acquisition of Imperial would significantly increase concentration, from an HHI of over 2,000 to an HHI of over 3,100, an increase of over 1,100 points.

39. These market concentration measures understate the likelihood that the transaction would harm competition. Some customers have specific preferences or needs for granulated refined sugar instead of liquid sugar; some customers have specific needs or preferences for bulk shipments over bagged sugar; and some customers have specific needs or preferences for cane sugar over beet sugar. All of these factors make Imperial and United particularly close competitors for many customers and, after the proposed transaction, United would likely be able to target these customers for additional price increases.

### B. The Proposed Transaction Would Eliminate Head-to-Head Competition between United and Imperial in Both Relevant Markets

40. United and Imperial often compete head-to-head to win customers' contracts. This competition has resulted in lower prices and more reliable service.

41. For example, for a certain large industrial customer with facilities across the United States, including in the relevant markets, United understood that Imperial was the customer's current supplier for a particular plant in the Southeast, having lost the business as the incumbent to Imperial a few years earlier. In bidding for this customer's 2022 refined sugar supply, United had its "eye on" winning this business back. United's bidding strategy focused on estimating and

beating the delivered price Imperial would offer. United even reached out to the railroad carrier serving Imperial and the customer to obtain competitive intelligence on Imperial's freight cost. Ultimately, United dropped its bid price significantly and won the business back for 2022.

42. For another large industrial customer's 2020-2021 sugar needs in the Southeast, United learned that the customer "decided to go with 'Savannah'"—in other words, Imperial. United lost the bid to Imperial because United's freight costs and additional charges were "not competitive compared to the competition," but United "was not too far off from competition."

43. United and Imperial do not just compete against each other aggressively for large industrial customers. For example, in 2020, United and Imperial were competing for a family-owned company's Southeast business. After the customer indicated that Imperial's price was too high to retain the business, Imperial came back with a lower price. The Imperial sales manager noted that it "Took a bit of back and forth, I thought we lost it, but we got it." In another bidding event for a regional, family-operated bakery in the Southeast, Imperial learned that incumbent United had lowered its bid price to maintain the business. Imperial therefore "want[ed] to offer [the customer] our very best, right off the top" and submitted a bid. "United came back" and bettered its previous offer, but Imperial was still able to win the business. The following year United wrested it back.

44. Customers use this head-to-head competition between United and Imperial as leverage in pricing negotiations. For example, when Imperial competed to win a large retail chain's business in the Southeast and Northeast, Imperial understood from the customer's feedback that Imperial was "competing with United cane" and was asked if Imperial had "any room to go down [in price] slightly." Imperial responded by reducing its bid price and won the customer's business.

45.     Customers similarly rely on head-to-head competition between the parties to negotiate more reliable terms of service.  For example, during the 2020 RFP process, United and Imperial competed to supply one food manufacturer's refined sugar.  After awarding Imperial the business, the customer notified United that its loss "really came down to service."

46.     United and Imperial often view each other as close competitors for a given customer's business and assess each other's ability to supply the customer.  For example, for one large industrial customer, Imperial took steps not to "tip off United" when reaching out to truck carriers to secure freight pricing to include in its bid.  Given the proximity of their refineries to each other, United and Imperial sometimes proactively lower prices to win business over the other.  For example, a United sales manager informed a customer in the Southeast that United had "a significant freight disadvantage over one competitor in Savanah [sic], GA [i.e., Imperial] which is why [United] went with a much lower" price to maintain the business.

47.     Imperial has been an important competitive constraint on United in both relevant markets.  The proposed transaction would eliminate this important competitive pressure, likely leading United to increase prices and face reduced pressure to provide reliable service.

### C.     The Proposed Transaction Would Increase the Incentive and Ability of Industry Giants United and Domino to Coordinate to Raise Prices and Reduce Quality

48.     Post-transaction, the few remaining producers of sugar would be more likely to coordinate with one another to the detriment of customers.  In both relevant markets, just two remaining producers, United and Domino, would control the overwhelming majority of sales.  With few significant rivals, it would be easier for the two to coordinate to raise prices to customers, such as by raising prices in parallel or refraining from trying to win one another's existing customers.  Indeed, after the deal was announced, a Domino Vice President apparently spoke

directly with Imperial's CEO, and then the Domino Vice President reported back to his colleagues that he thought the U.S. Sugar/Imperial transaction "likely is a good thing for us."  During the same discussion with the Domino Vice President, a Domino national sales director noted that "[i]t's going to be more important than ever to stay close to United."

49.     The transaction would more closely align the incentives of United and Domino, increasing the likelihood of coordination on price or other dimensions of competition.  The number of firms in a market is an important factor in assessing the ease of coordination, as are the size, product offerings, and other characteristics of those firms.  In particular, firms that are more similarly situated often have similar interests and therefore find it easier to coordinate on price or output.  Today, Domino is a very large vertically integrated firm that imports some raw sugar, whereas United is somewhat smaller and imports nothing, and Imperial is the smallest of the three and has no domestic sugar growing business to defend against imports.  After the acquisition, Imperial would be eliminated as an independent force, and United and Domino would both be very large firms with similar market shares and a similar level of vertical integration.  Both would benefit from a competitive détente.

50.     The refined sugar market is vulnerable to such coordinated interaction between competitors due to a number of factors.  Refined sugar is a relatively homogenous product, and there are high barriers to entry.  Refined sugar prices are also relatively transparent, and sugar producers regularly monitor their competitors' prices.  Both United and Imperial obtain competitive information about their rivals' pricing and capacity decisions from a variety of sources, including customers, distributors, and brokers.  This transparency is sufficient for firms to discern when their rivals are undercutting them on price or generally increasing prices.  It enables competitors to signal to each other to indicate a willingness to increase price and encourage

others to do the same.  In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower."  United's CEO testified that he was "confident" that "word got back" to United's competitors.

51.     Likewise, producers can readily identify which competitors are serving particular customers.  For example, United's Executive Vice President of Industrial Sales testified that "[m]ost of the trucking companies are aligned with one source or another" and "[t]he railcars are all numbered, so we . . . identify the routing of the car and understand where it was last loaded." He further testified that United can "send the sales manager to look at a bulk rail siting or a receiving location and figure out who's trucking the sugar in there" and thus "over time we come to understand what competitors might be at one location or another, or all."  This transparency is sufficient for competitors to avoid competing too aggressively to poach one another's existing customers.  For example, when Imperial was considering dropping its bid price to a customer in the Southeast in order to be more competitive with United, Imperial's Senior Vice President of Sales warned the CEO, "The main downside would be snatching something from United just as they are starting to show some upside price movement."

52.     Moreover, producers other than United and Domino would benefit from increased prices and therefore would not have the incentive to frustrate increased coordinated interaction between United and Domino.  Other producers also would not have the ability to undermine coordinated behavior by United and Domino by expanding sales into the relevant markets.  The small shares of other refined sugar producers in the relevant markets demonstrate that competition is regional and largely determined by transportation costs.  These costs also make it unlikely that these refined sugar producers would significantly increase sales into the relevant geographic markets in response to a price increase.

53.     Similarly, distributors would lack the ability to constrain the prices charged by refined sugar producers like United and Domino.  The prices and quantities of refined sugar that distributors can offer are dependent upon, and largely controlled by, the prices and terms set by the sugar producers, including United and Domino.  Indeed, sugar suppliers like United and Domino have the power to adjust terms and prices charged to distributors to curb their ability to compete.

### E.     The Most Vulnerable Customers Would Suffer Particularly Acute Harm

54.     Although United and Imperial compete in a relevant market that includes the sale of sugar refined from both sugarcane and beets, when assessing likely competitors and deciding what price to offer, United and Imperial factor in whether the customer has a specific demand for cane sugar.  For customers that purchase only cane sugar, such as for non-GMO or other marketing purposes, United and Imperial are particularly close substitutes.  Cane-only customers are unlikely to turn to a beet sugar producer in the event the price of cane sugar increases.  Beet sugar producers cannot switch to refining cane sugar at their beet sugar processing facilities.  Thus, customers that strongly prefer cane sugar over beet sugar are likely to face greater harm from the acquisition than other customers.

55.     Similarly, many customers need or prefer to use granulated refined sugar due to established product specifications or specialized manufacturing processes and therefore are unlikely to switch to liquid sugar if prices increase for granulated refined sugar.  These customers would likely suffer greater harm, as liquid-only sugar producers like CSC Sugar and Sucro Sourcing are not options even if they operate close to the customer.

## VI.    ABSENCE OF COUNTERVAILING FACTORS

### A.    Entry and Expansion Will Not Prevent the Substantial Harm Threatened by this Deal

56.    New entry or expansion by existing producers of refined sugar is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the relevant markets.  There are high barriers to building a sugar refinery, including the cost and time to develop sufficient refining capacity to serve the relevant geographic markets.  Existing sugar producers that do not currently serve these markets are unlikely to begin shipping a significant quantity of refined sugar into the relevant geographic markets due to the same factors—mainly transportation costs—that make them uncompetitive in these markets today.

### B.    USDA's Sugar Policy Will Not Prevent the Substantial Harm Threatened by this Deal

57.    Defendants have claimed that USDA's sugar program would safeguard against the substantial harm threatened by this deal.  But USDA's sugar program is not a substitute for antitrust enforcement and will not protect American grocers, food and beverage manufacturers, or consumers from the likely harm from this acquisition.  Put simply, competition matters.  USDA's program exists today, and yet it is vigorous competition among sugar refiners—not federal regulation—that sets the prices and terms of sale for refined sugar and that ensures that American families and food producers receive quality products and reliable service.  Indeed, despite the USDA's role, there are significant regional variations in the prices charged to customers due to differences in competitive conditions in each area.  Elimination of this robust domestic competition would result in higher prices and lower quality products and services.  It would also further strain beleaguered supply chains by forcing customers to turn to more distant or foreign suppliers for alternatives.  Thus, the transaction is unlawful under Section 7 of the Clayton Act, and challenging

it on that basis does not conflict with or impede the regulations administered by the USDA. The Supreme Court has rejected the argument that antitrust laws have no role in regulated industries, including in agriculture. *See United States v. Borden Co.*, 308 U.S. 188, 202 (1939); *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458 (1960). Rather, Section 7 requires "that forces of competition be allowed to operate within the broad framework of governmental regulation of the industry." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371-372 (1963).

58. USDA's sugar program exists to support robust domestic sugarcane and sugar beet farming. Nothing about the combination of two of the country's largest sugar refining corporations is necessary to ensure that American sugarcane and sugar beet farmers can continue to earn a good living. To the extent that American sugar farming needs additional support, USDA has the requisite policy tools. This merger is not necessary.

### C. There Are No Merger-Specific Efficiencies That Outweigh the Substantial Harm Threatened by this Deal

59. Defendants have claimed that this deal would allow U.S. Sugar to improve Imperial's operations. But such improvements can be achieved without eliminating the significant competition at stake in this deal. Time and again, history has shown that competition—not consolidation—drives corporations to improve their products. Grocers, food and beverage manufacturers, and consumers will be better off if these rivals continue to compete for their business.

### VII. JURISDICTION AND VENUE

60. The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.

61. Defendants U.S. Sugar, United, Imperial, and Louis Dreyfus are engaged in interstate commerce and in activities substantially affecting interstate commerce. Either directly or indirectly, Defendants process and sell refined sugar to customers in the United States, including in Delaware and throughout the Southeast. They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their sales of refined sugar have had a substantial effect on interstate commerce.

62. This Court has personal jurisdiction over each Defendant. U.S. Sugar, United, Imperial, and Louis Dreyfus transact business within this district. U.S. Sugar and Louis Dreyfus are incorporated in this district.

63. Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

## VIII. VIOLATIONS ALLEGED

64. Unless enjoined, U.S. Sugar's proposed acquisition of Imperial, as well as United's agreement to market and sell Imperial's refined sugar in the event of the closing of the proposed transaction, are likely to substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

65. The acquisition would likely have the following anticompetitive effects, among others, in the relevant markets:

    i. competition between United and Imperial in the production and sale of refined sugar to customers in the Southeast and in Georgia and its bordering states would be eliminated;

    ii. the acquisition would increase the likelihood of, or enable, successful anticompetitive competitor coordination in the production and sale of

refined sugar to customers in the Southeast, as well as in Georgia and its bordering states;

iii.    competition in the relevant markets would be reduced generally;

iv.    prices of refined sugar would likely increase to levels above what would prevail absent the transaction, forcing retailers, food and beverage manufacturers, and distributors in the Southeast and in Georgia and its bordering states to pay higher prices to buy refined sugar;

v.    the quality of refined sugar would likely be reduced; and

vi.    customer service, including delivery reliability, and choice would likely be reduced.

## IX.    REQUEST FOR RELIEF

66.    The United States requests that the Court:

(a)    adjudge U.S. Sugar's acquisition of Imperial to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)    permanently enjoin Defendants from consummating U.S. Sugar's proposed acquisition of Imperial, from implementing United's agreement to sell the sugar products of Imperial, and from entering into or carrying out any other transaction by which control of the assets or business of Imperial would be combined with U.S. Sugar and/or United;

(c)    award the United States its costs of this action; and

(d)    grant the United States such other relief as the Court deems just and proper.

Dated this 23rd day of November, 2021

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

*/s/* Jonathan S. Kanter
JONATHAN S. KANTER
Assistant Attorney General for Antitrust

DAVID C. WEISS
United States Attorney

*/s/* Kathleen S. O'Neill
KATHLEEN S. O'NEILL
Senior Director of Investigations & Litigation

*/s/* Laura D. Hatcher
LAURA D. HATCHER (#5098)
  Chief, Civil Division
SHAMOOR ANIS
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
E-mail: laura.hatcher@usdoj.gov
        shamoor.anis@usdoj.gov

*/s/* Craig W. Conrath
CRAIG W. CONRATH
Director of Civil Litigation

*/s/* Patricia C. Corcoran
PATRICIA C. CORCORAN
Acting Chief, Civil Operations

*/s/* Brian Hanna
BRIAN HANNA
JENIGH J. GARRETT
JONATHAN Y. MINCER
JILL PTACEK
CHINITA M. SINKLER
JESSICA J. TATICCHI
JOHN R. THORNBURGH II

*/s/* Robert A. Lepore
ROBERT A. LEPORE
Chief
Transportation, Energy & Agriculture Section

*/s/* Katherine Celeste Speegle
KATHERINE CELESTE SPEEGLE
Assistant Chief
Transportation, Energy & Agriculture Section

U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
Fax: (202) 616-2441
E-mail: Brian.Hanna2@usdoj.gov

Attorneys for the United States

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | United States Sugar Corporation, United Sugars Corporation, Imperial Sugar Company and Louis Dreyfus Company, LLC. |
| **(b)** County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant ___Henry, Florida___<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>See attachment | Attorneys *(If Known)*<br>Amanda Reeves, Latham & Watkins (United States Sugar Corp., United Sugars Corp.); Amanda Wait, Norton Rose Fulbright (Imperial Sugar Company, Louis Dreyfus Company, LLC) |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability ☐ 368 Asbestos Personal | | New Drug Application | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Protection Act |
| ☐ 190 Other Contract | Product Liability ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury ☐ 385 Property Damage | ☐ 751 Family and Medical | | Exchange |
| | ☐ 362 Personal Injury - Product Liability | Leave Act | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights **Habeas Corpus:** | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment ☐ 510 Motions to Vacate | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Sentence | | | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Clayton Act, 15 U.S.C. 18

Brief description of cause:
Injunction against transaction that would violate Section 7 of the Clayton Act, 15 U.S.C. 18

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE 11/23/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Laura D. Hatcher (5098)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Counsel for the United States**

Brian Hanna
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
(202) 460-4294
brian.hanna2@usdoj.gov


Laura D. Hatcher (#5098)
   Chief, Civil Division
Shamoor Anis
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
(302) 573-6205
laura.hatcher@usdoj.gov
shamoor.anis@usdoj.gov